## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MANOUCHEKA SIMON,** | : | **No. 1:23-CV-1802** |
| | : | |
| **Plaintiff,** | : | **(Caraballo, M.J.)** |
| | : | |
| **v.** | : | |
| | : | |
| **FRANK BISIGNANO,**[1] | : | |
| **Commissioner of Social** | : | |
| **Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

## I.   Introduction

Plaintiff Manoucheka Simon seeks judicial review of the final

decision of the Commissioner of Social Security (the "Commissioner")

denying her application for disability insurance benefits under Title II

of the Social Security Act. The Court has jurisdiction pursuant to Title

42, United States Code, Section 405(g), and Title 28, United States

Code, Section 636(c).

---

[1] Frank Bisignano was confirmed as the Commissioner of the Social Security
Administration on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure and 42 U.S.C. § 405(g), Frank Bisignano is substituted as the defendant
in this suit.

This matter comes before the Court on Simon's claims that Administrative Law Judge ("ALJ") Michelle Wolf erred when she: (1) evaluated the medical opinion of Ronald Pyram, M.D.; and (2) evaluated the medical opinion of Daniel Upton, M.D. Doc. 14 at 8–14. The matter is fully briefed and ripe for decision.

As explained below, ALJ Wolfe's evaluation of Dr. Pyram's opinion was not supported by substantial evidence in the record permitting meaningful judicial review. Accordingly, the Commissioner's decision to deny Simon's claim for social security disability benefits will be vacated and this case will be remanded to the Commissioner for further proceedings consistent with this memorandum.

## II.   <u>Background</u>

On December 17, 2018, Simon applied for social security disability insurance benefits. Doc. 10 at 84 (hereinafter referred to as "Tr."). Simon alleged complete disability from a myriad of impairments, including high cholesterol, diabetes, neuropathy, a detached retina, high blood pressure, back issues, arthritis, and vision issues in both eyes. *Id.* Simon's application was initially denied on April 2, 2019, after which she requested a hearing before an ALJ. *Id.* at 100–05.

2

On November 19, 2019, ALJ Wolfe presided over Simon's first hearing. *Id.* at 15. Subsequently, on February 26, 2020, ALJ Wolfe issued a decision concluding that Simon was not disabled between the operative dates of August 24, 2018, through the date of the decision. *Id.* at 29. After the Social Security Appeals Council denied her request for review, Simon filed an appeal with this Court on March 12, 2021. Tr. 2173.

Upon the government's motion and with Simon's concurrence, on October 14, 2021, the Court remanded the case back to the Commissioner for further proceedings before an ALJ "to reevaluate Dr. Pyram's opinion that Plaintiff would require unscheduled breaks during the workday." *Id.* at 2182–85. Pursuant to the Court's remand order, on June 1, 2023, ALJ Wolfe held a second hearing. *Id.* at 2118.

At the hearing, ALJ Wolfe received various evidence of record, including clinical records, medical history, medical expert reports, vocational expert testimony, Simon's own testimony, and, critically, Dr. Pyram's testimony. *Id.* at 2120–42. On August 30, 2023, ALJ Wolfe issued a second unfavorable decision, concluding that Simon was not disabled between the operative dates of August 24, 2018, through

3

February 29, 2020. *Id.* at 2111. ALJ Wolfe reached that conclusion by employing a five-step analytical process required under the Social Security Act to evaluate disability insurance and supplemental security income claims. *See* 20 C.F.R. § 404.1520(a)(4).

The process requires sequential consideration of: (1) whether the claimant is engaged in substantial gainful work activity; (2) the medical severity of the claimant's impairments; (3) whether the impairment meets or equals a defined list of impairments; (4) a comparison between the claimant's past relevant work and residual functional capacity, *i.e.*, the most work that a claimant can perform despite his or her limitations, *see* 20 C.F.R. § 404.1545(a); and (5) an assessment of the claimant's residual functional capacity and his or her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i)–(v). Should a claimant proceed past the first three steps of the analysis, the Commissioner will not find the claimant disabled when he or she can perform past relevant work, or adjust to other work, under the third and fourth steps, respectively. *Id.* at § 404.1520(a)(4)(iv)–(v), (f), (g).

Applying that analysis, ALJ Wolfe first determined that Simon met the insurance requirements of the Social Security Act, *see* 20 C.F.R.

4

§ 404.130, through June 30, 2023. Tr. 2096. ALJ Wolfe also found that Simon had not engaged in substantial gainful activity between her "alleged onset date of August 24, 2018 through February 29, 2020, the period at issue on remand[.]" *Id.*

At the second step of the analysis, ALJ Wolfe found that Simon suffered from six severe impairments: diabetic mellitus with diabetic retinopathy bilaterally, with right eye traction retinal detachment involving macular and hemorrhage status post pars plana vitrectomy, and left eye with macula edema, right eye cataract status post Phaco with intraocular lens, peripheral neuropathy, and diffuse idiopathic skeletal hyperostosis. *Id.* at 2097. The ALJ also identified several non-severe impairments, including, among others, hypertension, mild concentric left ventricular hypertrophy, hyperlipidemia, microalbuminuria, hyperglyceridemia, closed fracture of rib, left breast mass/hematoma, hypercholesterolemia, hypermagnesemia, and chronic kidney disease. *Id.* She found that these latter conditions were non-severe because they were well treated by physicians and because the evidence showed no "more than a minimal effect on the claimant's ability to perform basic work activities[.]" *Id.* at 2098.

5

Moving to the third step of the analysis, ALJ Wolfe determined that Simon's six severe impairments failed to meet or medically equal one of the impairments listed in the Social Security Administration's regulations. *Id.* at 2099. Simon thus did not automatically qualify as disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.").

Accordingly, ALJ Wolfe proceeded to determine Simon's residual functional capacity, before addressing the final two steps in the sequential analysis. Based on the evidence of record, ALJ Wolfe concluded that Simon could perform light work, subject to a range of additional exertional, postural, and environmental limitations. Tr. 2100–01. In reaching that conclusion, ALJ Wolfe considered one piece of evidence germane to this opinion—the medical opinion testimony of Dr. Ronald Pyram, an endocrinologist who treated Simon in 2018 and 2019. *Id.* at 2053–61.

Dr. Pyram's testimony concerned his October 21, 2019, medical opinion, which stated that, because of her diabetes, Simon would

require two or three, 10- to 15-minute unscheduled breaks during an average workday to check and address her glucose levels. *Id.* at 2054. At the hearing, Dr. Pyram testified that his finding was due, at least in part, to Simon's uncontrolled diabetes, which caused unpredictable glucose spikes or lows throughout the day. *Id.* at 2124–26. By contrast, Dr. Pyram testified that controlled diabetics, in ideal conditions, usually do not require two or three unscheduled daily breaks to check their glucose. *Id.* at 2126. Rather, because they are not commonly subject to the same blood sugar volatilities as uncontrolled diabetics, Dr. Pyram testified that controlled diabetics, as a baseline, require four glucose checks a day to keep their glucose levels stable. *Id.* at 2126, 2129–30.

Importantly, Dr. Pyram testified that although well-controlled diabetics must check their glucose levels *at least* four times daily to keep their levels stable, "[o]ftentimes, additional checks [are required] if [glucose] goes too high or too low[]" because of something trivial like "taking a little extra sugar in a meal[.]" *Id.* at 2130. Consistent with the variability recognized in this answer, and in further response to a question from the ALJ about whether three scheduled breaks a day

7

would be sufficient for a well-controlled diabetic to check his or her glucose, Dr. Pyram only responded that "[i]t's possible." *Id.*

In reviewing Dr. Pyram's testimony and findings compared to the record, ALJ Wolfe deemed the opinion unpersuasive. Tr. 2108. Although not abundantly clear, the ALJ appears to have based this conclusion, in the first instance, on Dr. Pyram having only treated Simon twice. *Id.* Second, ALJ Wolfe's conclusion also appears to hinge on her characterization of Dr. Pyram's testimony as stating that Simon required "unscheduled breaks lasting 10-15 minutes only . . . if her blood sugar is uncontrolled." *Id.* Similarly, the ALJ's conclusion was contingent on her construal of Dr. Pyram having "testified that he recommends testing 4 times a day, before breakfast, lunch, dinner, and bed," which meant, in the ALJ's view, that because jobs come with lunch breaks, Simon would not consistently need unscheduled breaks to check her glucose. *Id.*

After finding Dr. Pyram's opinion unpersuasive, ALJ Wolfe deemed Simon capable of performing light work subject to limitations. This brought her to the fourth step of the analysis, to determine whether Simon was disabled within the meaning of the Social Security

8

Act. Here, with assistance from the testimony of two vocational experts, ALJ Wolfe compared Simon's past relevant work and residual functional capacity, finding that Simon was unable to perform her prior employment as a research assistant, employment clerk, or medical records auditor. *Id.* at 2108–09.

Finally, in the fifth step of the sequential analysis process, ALJ Wolfe considered Simon's age, education, work experience, and residual functional capacity to perform light work, concluding that "there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" *Id.* at 2109. Here, ALJ Wolfe again leveraged testimony from a vocational expert, who advised that an individual fitting Simon's parameters could perform the occupational requirements of a non-postal mail clerk, router, or clerical assistant. Tr. 2110–11.

As a result of this analysis, ALJ Wolfe determined that Simon was not disabled and denied her application for disability benefits. *Id.* at 2111. Simon unsuccessfully appealed the decision to the Social Security Administration's Appeals Council, which denied Simon's request to review ALJ Wolfe's decision on December 26, 2024. Doc. 14 at 13.

9

Having exhausted her administrative remedies, Simon's instant appeal to the district court followed.

Simon initiated this action with the Court on October 31, 2023. Doc. 1. The Commissioner filed an answer and provided the requisite transcripts from the disability proceedings on December 13, 2023. Docs. 9–10. The parties then filed their respective briefs, Docs. 14, 17–18, with Simon alleging two errors warranting reversal or remand, Doc. 14 at 8–14. Specifically, Simon avers that ALJ Wolfe: (1) erred when evaluating the medical opinion of Dr. Pyram, contending that the ALJ's articulation of the supportability and consistency of this opinion was insufficient to permit meaningful judicial review; and (2) erred when evaluating the supportability and consistency of the medical opinion of Dr. Daniel Upton, Simon's ophthalmologist. *Id.*

## III.  Discussion

### A.  Standard of Review

Review of the Commissioner's decision denying a claimant's application for social security disability benefits is limited to determining whether the factual findings of the final decisionmaker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g);

*Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial in this context is "more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Put more pointedly, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)) (citations omitted).

In an adequately developed record, this can mean "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n.*, 383 U.S. 607, 620 (1966). Under this highly deferential standard, "[f]actual findings which are supported by substantial evidence *must* be upheld." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012) (emphasis added); 42 U.S.C. § 405(g).

Thus, the Court's role under this standard is not to re-weigh the evidence and make factual determinations, but to simply review the record to ensure factual findings are supported by substantial evidence, and to confirm that the ALJ provided a "discussion of the evidence and

11

explanation of reasoning for his conclusion sufficient to enable judicial review." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). And although an ALJ's decision must "reasonably articulat[e]" its reasoning so "a subsequent reviewer or a reviewing court" can trace its path, 82 Fed. Reg. 5844-01, 5858 (2017), an ALJ need only give "some indication" of their consideration of probative evidence to successfully carry this burden of articulation. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

That said, when there is countervailing, probative evidence, an ALJ must "give some reason for discounting the evidence she rejects." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *cf. Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (holding that the substantial evidence standard is unmet when an ALJ fails to resolve a conflict created by countervailing evidence.). In the context of evaluating the persuasiveness of medical opinions, which are often some of the most probative evidence available, an ALJ is required to assess the level of support and consistency the opinion has against the record. 20 C.F.R. § 404.1520c. Here, ALJ Wolfe's factual findings on the consistency and supportability of Dr. Pyram's testimony were not

12

supported by substantial evidence in the record, leaving the Court unable to conduct a meaningful judicial review.

## B.    The ALJ's Evaluation of Dr. Pyram's Opinion

Simon contends that ALJ Wolfe erred in her evaluation of the medical opinion of Dr. Pyram, because the ALJ did not provide a sufficient explanation concerning its supportability and consistency when deeming it unpersuasive, and that this error was not harmless. Doc. 14 at 9–12. In opposition, the Commissioner contends that the record, read as a whole, supports the ALJ's finding. Doc. 17 at 11–17. As set forth below, the ALJ's evaluation of Dr. Pyram's opinion mischaracterized the evidence while assessing its supportability and consistency, thus rendering the corresponding findings unsupported by substantial evidence.

When evaluating a medical opinion, an ALJ is required to assess its support and consistency against the record. 20 C.F.R. § 404.1520c. The supportability of a medical opinion "increases as the relevance of the objective medical evidence and explanations presented by the medical source increases." *Vellone v. Saul*, 2021 WL 319354, at *6 (S.D.N.Y. 2021), *report and recommendation adopted*, 2021 WL 2801138

13

(S.D.N.Y. 2021) (citing 20 C.F.R. § 404.1520c(c)(1)). The consistency assessment is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Clay v. Kijakazi*, 2022 WL 13989015, at *3 (N.D. Miss. 2022) (quoting 20 C.F.R. § 404.1520c(c)(1)).

Because an ALJ's duty of articulation requires just "some indication" of his or her consideration of probative evidence, *Burnett*, 220 F.3d at 121, an ALJ's assessment of a medical opinion's consistency and supportability "need not discuss every piece of evidence in the record." *Gamret v. Colvin*, 994 F. Supp. 2d 695, 698 (W.D. Pa. 2014). However, it must, at a minimum, build " 'an accurate and logical bridge between the evidence and the result.' " *Id.* (quoting *Hodes v. Apfel*, 61 F. Supp. 2d 798, 806 (N.D. Ill. 1999); and *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). Further, in assessing whether an ALJ has provided an adequate analysis for rejecting or accepting an opinion, the court must look to the ALJ's opinion as a whole, not only the part directly addressing the particular medical opinion. *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) ("[T]he ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching

14

the conclusion that [claimant] did not meet the requirements for any listing[.]").

The sufficiency of an evaluation turns on the extent to which its reasoning is driven by an ALJ's accurate read of the evidence—and the court's ability to discern that evidentiary reasoning. *See, e.g., Price v. Astrue*, 401 F. App'x 985, 986 (5th Cir. 2010) ("The ALJ does not need to comment on every piece of evidence, but only must build an accurate and logical bridge between the evidence and the final determination.") (citing *Glomski v. Massanari*, 172 F. Supp. 2d 1079, 1082 (E.D. Wis. 2001)); *Acosta Cuevas v. Comm'r of Soc. Sec.*, 2021 WL 363682, at *15 (S.D.N.Y. 2021), *report and recommendation adopted sub nom.*, 2022 WL 717612 (S.D.N.Y. 2022) ("The ALJ must provide a reviewing Court with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence.").

Here, on October 21, 2019, Dr. Pyram provided a written medical opinion on behalf of Simon regarding the impact of her diabetes on her ability to function. Tr. 2057. That opinion was based on Dr. Pyram's experience as Simon's endocrinologist in 2018 and 2019, and noted that

Simon's uncontrolled diabetes caused her fatigue, infections/fevers, general malaise, retinopathy, and visual impairment. *Id.* at 2053. Of critical importance, Dr. Pyram opined that Simon's condition would require her to take two or three unscheduled, 10- to 15-minute long breaks each workday to check and manage her glucose level. *Id.* at 2054. This latter finding, and reevaluating its precise impact on Simon's functionality, was the impetus behind this Court's initial October 14, 2021, remand order, which instructed the Commissioner "to reevaluate Dr. Pyram's opinion that Plaintiff would require unscheduled breaks during the workday." Tr. 2182–85.

Pursuant to that order and an administrative subpoena, Dr. Pyram testified about the unscheduled breaks at the June 1, 2023, hearing before ALJ Wolfe. In response to a question from ALJ Wolfe about how often Simon would need unscheduled breaks, in addition to scheduled breaks occurring every two hours, Dr. Pyram explained:

> Yes, so, I see that—oftentimes with very uncontrolled diabetes, oftentimes she was either spiked or [would] go low in the middle of the [day]. So, it could happen once a day, it could happen no time a day, it could happen two, three times a day and it needs to be corrected. It can be corrected easily within 15 minutes if she gets like that. Fifteen minutes in general. . . . So, that was my opinion at the time.

16

Tr. 2125 (cleaned up). When ALJ Wolfe subsequently inquired whether a well-controlled diabetic would need as many unscheduled breaks as Dr. Pyram opined Simon required, Dr. Pyram answered that "[u]sually well-controlled diabetics don't need that many breaks in between. Yes." *Id.* at 2126.

However, the ALJ later asked Dr. Pyram a question premised on whether Simon would only need to check her glucose four times a day if her diabetes was well-controlled. Dr. Pyram responded:

> In general, it's at least four times a day. Sometimes, it's more because if for whatever reason it goes too low, taking a little extra sugar in a meal, it might go too high. In general, if you're on insulin, at least four times a day. Oftentimes, additional checks if it goes too high or too low.

*Id.* at 2130. When ALJ Wolfe asked whether three scheduled breaks during the workday, including lunch, would suffice for a well-controlled diabetic to check their glucose, Dr. Pyram expressed ambivalence, stating that "[i]t's possible." *Id.*

In her decision denying Simon's claim, ALJ Wolfe reviewed Dr. Pyram's opinion and deemed it unpersuasive, stating:

> The undersigned considered the opinion of Ronald Pyram, MD and did not find it persuasive (Hearing Record, 6/1/23, Exhibit B21F). Dr. Pyram indicates that the claimant "may sometimes" need to take unscheduled breaks 2-3 times during

17

a workday, for 10-15 minutes. The doctor's opinion is based on two examinations, with the last one occurring more than nine months prior to when the doctor saw the claimant. That said, the doctor testified in June 2023, that the claimant's need to take 2-3 unscheduled breaks lasting 10-15 minutes, is so that she could correct her blood sugar level if it spikes or drops. Also, he said the unscheduled breaks to check the blood sugar is due to uncontrolled diabetes. While he also said the need to check her blood sugar level continues when diabetes is controlled, according to his testimony, the need for the unscheduled breaks lasting 10-15 minutes only applies if her blood sugar is uncontrolled. Thus, as the record reflects that while doctors 2 visits note she had uncontrolled blood sugar, thereafter, the record reflects that her blood sugar is better controlled as she is testing it, and her ulcer healed. Moreover, while the claimant continues to need to check her blood sugar level, the doctor testified that he recommends testing 4 times a day, before breakfast, lunch, dinner, and bed, and as she has a lunch break, the glucose check for that time of the day does not require an unscheduled break on a consistent basis. Thus, considering that the record reflects improvement in her diabetes with the A1C going from 14 to 9.7, and she is using insulin and taking Ozempic, the record does not support that the claimant would need to take 2-3 unscheduled breaks. For these reasons, the doctor's opinion is not persuasive.

*Id.* at 2108.

This evaluation of Dr. Pyram's opinion, challenged by Simon now on appeal, did not accurately summarize the testimony and therefore is not supported by substantial evidence. Despite ALJ Wolfe's conclusions to the contrary, Dr. Pyram never testified that his recommendation for Simon to take "unscheduled breaks to check [her] blood sugar is due to

18

[Simon's] uncontrolled diabetes[,]" or that "the need for the unscheduled breaks lasting 10-15 minutes only applies if her blood sugar is uncontrolled." *Id.* Rather, Dr. Pyram offered more nuanced answers to questions about well-controlled versus uncontrolled diabetes, and the potential impact either condition has on a work schedule.

Dr. Pyram opined that, generally, "well-controlled diabetics don't need" two or three unscheduled breaks in a workday, as he recommended for Simon. Tr. 2126. Dr. Pyram later clarified, however, that even assuming Simon had well-controlled diabetes, she would still need to check her glucose *at least* four times a day, and that "[o]ftentimes" additional, unscheduled glucose checks would prove necessary. *Id.* at 2130. Dr. Pyram testified that even controlled diabetics are still subject to glucose spikes or lows arising from minor dietary variances. *Id.* Finally, Dr. Pyram declined to confirm that three regularly scheduled breaks during a workday would suffice for a well-controlled diabetic to check his or her glucose levels; instead, he only responded that it was "possible." *Id.*

Thus, Dr. Pyram did not solely attribute his recommendation of unscheduled breaks to Simon's uncontrolled diabetes. Moreover, rather

19

than testify that unscheduled breaks were only necessary so long as Simon's diabetes remained uncontrolled, Dr. Pyram instead indicated that even if her condition were well-controlled, Simon may nonetheless require unscheduled glucose checks if her glucose spikes or lowers because of small dietary variances.

The gap between Dr. Pyram's statements, and ALJ Wolfe's characterization of that testimony, is significant for at least two reasons. First, ALJ Wolfe's determination that Dr. Pyram's opinion was unpersuasive was premised largely on this inaccurate read of his testimony. Indeed, after the ALJ concluded that Dr. Pyram only recommended that Simon take unscheduled breaks so long as her diabetes remained uncontrolled, ALJ Wolfe found that because Simon's glucose was more recently "better controlled," Simon therefore "does not require an unscheduled break on a consistent basis." Tr. 2108. This conclusion both misconstrued Dr. Pyram's opinion, and failed to account for Simon's testimony, which was consistent with Dr. Pyram's recommendation, in stating that "[w]hen I was at work, I would check it about three or four times," plus two more times at home each day. *Id.* at 2134–35.

20

Where, as here, an assessment of a medical opinion is anchored to a faulty premise and ignores probative, countervailing evidence, a material error exists. *See Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) ("[T]he ALJ cannot reject evidence for no reason or for the wrong reason[.]"); *Brownawell v. Comm'r Of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008) ("The ALJ supports his rejection of [the physician's] opinion of disability in large part on evidence that does not exist . . . . This mistake, and others like it, indicate that the ALJ's decision to discredit [the physician] was not supported by substantial evidence. Furthermore, the ALJ mischaracterizes the evidence that does exist[.]"); *Layton v. Astrue*, 2010 WL 521190, at *8 (W.D. Pa. 2010) ("An ALJ's rejection of a . . . physician's opinion is not supported by substantial evidence where it is based upon factual inaccuracies or mischaracterizations of the evidence.").

Second, Simon has met her burden to show that the error may not be harmless. "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) (quoting *Renchenski v. Williams*, 622 F.3d

21

315, 341 (3d Cir. 2010)). In other words, remand is warranted under the harmless error analysis "only if there is reason to believe that the remand might lead to a different result." *Minarsky v. Kijakazi*, 747 F.Supp.3d 801, 816 (M.D. Pa. 2024) (internal quotations omitted). The plaintiff bears the burden of showing that an error was harmful. *Id.* at 817.

Simon contends that testimony elicited from the vocational expert at step five of the sequential analysis shows that the error was not harmless. According to Simon, the vocational expert testified that, if an individual with her characteristics required the number of unscheduled breaks recommended by Dr. Pyram, it would preclude the ability to work. Doc. 14 at 11–12; Doc. 18 at 5–6. Simon further avers that had the ALJ not erred in deeming Dr. Pyram unpersuasive, the ALJ would have been required to elicit more testimony from the vocational expert concerning Dr. Pyram's recommended limitations. *Id.*

That position is consistent with the record. In response to a question by counsel about the impact of the limitations recommended by Dr. Pyram on Simon's work ability, the vocational expert specifically testified that "[t]he limitation impacts the productivity to the level that

22

we spoke [of], . . . [and] would preclude work." Tr. 2140 (cleaned up). Thus, had the ALJ not erred when evaluating Dr. Pyram's opinion, a contrary conclusion concerning its persuasiveness, coupled with the vocational expert's testimony, may have yielded a work preclusive finding. *Id.* Although the Court takes no position on the merits of her underlying contention, Simon has met her burden to show that "there is reason to believe that the remand might lead to a different result." *Minarsky*, 747 F. Supp. 3d at 816; *see also Kimberly L. v. Comm'r of Soc. Sec.*, 2024 WL 4571429, *9 (M.D. Pa. 2024) ("Courts have found, however, that such an error is harmful where the result could be different if the opinions at issue were given full consideration."); *Jose V. v. O'Malley*, 2024 WL 4583529, at *11 (M.D. Pa. 2024) ("To decide whether an error is harmful or harmless, courts consider whether remand might reasonably lead to a different result. If there is a reasonable possibility that it could, the error at issue is harmful.").

The Commissioner's contentions that the ALJ did not err in her evaluation of Dr. Pyram's opinion or, alternatively, that any error is harmless, are unavailing. First, the Commissioner's focus on Dr.

Pyram's limited treatment history with Simon, and on evidence indicating improved management of her diabetes, Doc. 17 at 14–15, fails to rehabilitate the ALJ's mistaken evaluation of Dr. Pyram's testimony.

Second, that mistake cannot be deemed harmless, as it proved central to the ALJ's finding that Dr. Pyram's opinion was unpersuasive. And as the Commissioner acknowledges, *id.* at 16–17, had the ALJ deemed Dr. Pyram's testimony consistent and supported—and therefore persuasive—it may well have altered her ultimate evaluation of the vocational expert's testimony. As the vocational expert testified that limitations like those recommended by Dr. Pyram would be work preclusive, incorporating such testimony into the ALJ's decision may have led to a finding of disability.

Accordingly, remanding this matter to the Commissioner is warranted. And as remand is warranted on this first claim of error, there is no need for the Court to address the second claim of error. *See Chinchilla v. Geodis Am., Inc.,* 2024 WL 943424, at *8 n.12 (D.N.J. 2024) (declining to address subsequent arguments on a motion for remand when the motion was decided on other grounds).

24

## C.    Awarding Benefits

Finally, this case will be remanded without awarding benefits, as Simon requests. Doc. 14 at 15. "A district court, after reviewing the decision of the Secretary may, under 42 U.S.C. § 405(g)[,] affirm, modify, or reverse the [Commissioner]'s decision with or without a remand . . . for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984). The Court may direct that benefits be awarded "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id.* at 221–22 (citations omitted). "When faced with such cases, it is unreasonable for a court to give the ALJ another opportunity to consider new evidence concerning the disability because the administrative proceeding would result only in further delay in the receipt of benefits." *Id.* at 222 (footnote omitted).

As set forth above, remand is necessary here because the ALJ's evaluation of a medical opinion is not supported by substantial evidence permitting meaningful judicial review. However, this reason for remand is limited in scope, and it is not clear, to any reasonable degree of certainty, that proper evaluation of Dr. Pyram's opinion will lead to a

25

disability determination. *See Podedworny*, 745 F.2d at 221; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, [or] if the agency has not considered all relevant factors, . . . the proper course[] . . . is to remand to the agency for additional investigation or explanation."); *Diaz*, 577 F.3d at 504. Indeed, the Court does not intend for this remand to be construed as taking any position on the merits of Simon's substantive claim of disability, or whether Dr. Pyram's testimony should be deemed persuasive.

## IV.   <u>Conclusion</u>

For the reasons set forth above, the Court will vacate the decision of the Commissioner and remand this case for further proceedings consistent with this memorandum. A separate order shall be issued.

Date: March 10, 2026                  *s/ Phillip J. Caraballo*
                                       Phillip J. Caraballo
                                       United States Magistrate Judge